**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANTHONY SMITH, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**AKELA CONTRACTING LLC; AKELA CONTRACTING/CIVETTA COUSINS JV, JOINT VENTURE, LLC; JDV SAFETY INC.; ALL EYES ON SAFETY INC; KARINE WILLIAMS, individually; and BRIAN MCDERMOTT, individually,**<br><br>**Defendants.** | **Case No. 22 Civ. 01185 (VSB) (KHP)** |

**DECLARATION OF ARMANDO A. ORTIZ IN SUPPORT OF UNOPPOSED MOTION FOR APPROVAL OF FLSA COLLECTIVE SETTLEMENT**

I, Armando A. Ortiz, affirm under the penalties of perjury as follows:

1.      I am a partner of Fitapelli & Schaffer, LLP ("Counsel" or "F&S") in New York, New York, counsel of record for Plaintiffs in this matter. F&S is a well-respected and nationally recognized employment litigation firm based in New York City that represents plaintiffs in a variety of employment matters, including individual and class action litigation involving wage and hour, discrimination, and harassment claims, as well as contract and severance negotiations.

2.      I am one of the lawyers primarily responsible for prosecuting Plaintiffs' claims.

3.      I submit this Declaration to place before the Court certain facts and documents in support of the Unopposed Motion for Approval of the FLSA Collective Action Settlement (the "Motion").

## PROCEDURAL HISTORY

### Overview of Investigation and Commencement of Action

4.    Before initiating the instant action, F&S conducted a thorough investigation into the various defendants named in this lawsuit, specifically, Akela Contracting LLC ("Akela"), Akela Contracting/Civetta Cousins JV, Joint Venture, LLC (the "JV", and, together with Akela, the "Akela Entities"), and Karine Williams ("Ms. Williams", and, together with the Akela Entities, the "Akela Defendants"), and JDV Safety Inc. ("JDV"), All Eyes on Safety Inc. ("AES"), and Brian McDermott ("Mr. McDermott", and, together with JDV and AES, the "JDV Defendants").   The Akela Defendants and JDV Defendants shall hereinafter be referred to, collectively, as the "Defendants". This background investigation assisted F&S in determining the size and scope of both the Akela Defendants and the JDV Defendants' businesses, including contracts with the City of New York for public works.

5.    Furthermore, F&S conducted an in-depth interview with Anthony Smith (the "Named Plaintiff"), who worked as a crossing guard/ non-union flagger for the JDV Defendants at various of the Akela Defendants' jobsites. This interview helped F&S determine the hours that he and other similarly situated workers were working, the wages they were paid, and the nature of their duties. F&S continued its investigation by speaking with other crossing guards/non-union flaggers and determined that class treatment of this matter was appropriate. These interviews, along with our investigation, provided insight into the underlying merits of Plaintiffs' claims, the defenses that Defendants would likely raise, factual and legal research as to the proper measure of damages, and the likelihood of collective and class action certification.

6.    On February 11, 2022, F&S filed the original complaint in this action, bringing claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"), as

well as a claim sounding in breach of contract pursuant to a third-party beneficiary theory of liability. *See generally* ECF No. 1.  As concerns the latter, the Named Plaintiff alleged that he and his fellow crossing guards/non-union flaggers were the third-party beneficiaries of the contracts into which the Akela Defendants had entered with the City in connection with the public improvement projects relevant to the action, and, specifically, the provision thereof that mandated that eligible workers on those projects be paid a prevailing wage for the work that they performed. *See generally id*.

## Litigation and Discovery in This Matter

7.      After the Defendants requested additional time to respond to the Complaint, the Parties jointly sought a stay of the case to participate in a private mediation, which was granted on June 23, 2022. ECF No. 36-37. The stay expired on September 21, 2022. *Id.*

8.      Ultimately, the parties did not attend a private mediation during this time frame.

9.      Plaintiff filed the operative First Amended Complaint ("FAC") on October 3, 2022, clarifying and correcting certain named defendants. ECF No. 44.

10.      Both the Akela Defendants and JDV Defendants filed answers, respectively, to the FAC, denying liability. *Se generally* ECF Nos. 60 (JDV Defendants' Answer); 63 (Akela Defendants' Answer).

11.      The Parties held their Rule 26(f) conference, and filed their proposed case management plan and scheduling order, on September 29, 2022, which was so-ordered by the Court. ECF No. 72.

12.      On February 14, 2023, the Akela Defendants filed a third-party complaint over against the City of New York. ECF No. 81. Additionally, the Akela Defendants and JDV Defendants filed cross claims against each other in subsequent pleadings. ECF No. 80, 85.

13.     In the spring of 2023, and following protracted discussions and negotiations, the parties to the prime action stipulated to the conditional certification of a FLSA § 216(b) collective action (the "Collective Action"), which was filed with the Court on July 12, 2023, and thereafter so-ordered by the Honorable Vernon S. Broderick, U.S.D.J. ECF No. 104.

14.     Prior to the dispatch to prospective opt-in plaintiffs of the FLSA § 216(b) notice upon which the parties to the prime action had agreed (the "Collective Action Notice"), 12 persons had opted in to the conditionally certified FLSA collective action.

15.     Copies of the Collective Action Notice were sent to the putative collective members via USPS First Class Mail and text message (to the extent telephone numbers were in JDV's possession) on August 22, 2023, and wherein each putative collective member was advised that, in order to timely opt in to the conditionally certified Collective Action, he/she must return a properly completed form consenting to his/her joinder of the Collective Action within sixty (60) days of the date of dispatch of the Collective Action Notice (the "Collective Action Notice Period").

16.     By the end of the Collective Action Notice Period, 13 additional individuals had joined the conditionally certified Collective Action as opt-in plaintiffs. Thus, as of the date of filing of the instant motion, 25 individuals have opted in to the conditionally certified Collective Action (collectively, the "Opt-In Plaintiffs", and, together with the Named Plaintiff, the "Plaintiffs").

17.     On January 24, 2024, the Parties filed a second proposed case management plan and scheduling order, which was subsequently so-ordered by Judge Broderick. ECF No. 147. This scheduling order directed that all fact discovery be completed by October 4, 2024, and all discovery (including experts) be completed by December 3, 2024.

18.     Concurrently with all of the foregoing, the Parties engaged in significant discovery. Specifically, Plaintiffs served interrogatories and requests for the production of documents upon the

Akela Defendants and JDV Defendants, respectively. In response, Plaintiffs received thousands of pages of relevant documents responsive to their productions requests from the Defendants, including, but not limited to, certified payroll records evidencing the hours and monies paid to all workers that furnished labor and/or services in furtherance of the public works construction projects relevant to this action, among them the project known more commonly as "Flatlands" ("Flatlands"). It bears noting, for purposes of the instant motion, that Flatlands project was the largest of the public improvement projects relevant to this action, and in connection with which Defendants had, throughout its prosecution, recorded the greatest number of crossing guard/non-union flagger hours. In sum, Plaintiffs received more than sufficient payroll documentation and information with which to create a damages model for both the Opt-In Plaintiffs and members of a putative New York Labor Law class.

19.    Likewise, Defendants caused interrogatories and requests for the production of documents to be served upon all Plaintiffs. Plaintiffs' Counsel objected to those of the Akela Defendants' written discovery requests that had been directed to the Opt-In Plaintiffs on the grounds that they believed same to be unduly burdensome. The relevant Parties met and conferred with respect to these objections, after which Akela caused to be served on the Opt-In Plaintiffs revised written requests, to which each of the Opt-In Plaintiffs duly responded by way of service of written responses and productions of whatever documents responsive to the requests they had identified as being in their custody, possession or control.

20.    On March 13, 2024, the Parties appeared before the Honorable Katherine H. Parker, U.S.M.J., for a settlement conference (the "First Settlement Conference"). Specifically, the Named Plaintiff and several of the Opt-In Plaintiffs appeared on Plaintiffs' behalf, while Defendant Karine Williams ("Ms. Williams") appeared on behalf of the Akela Defendants, and Defendant Brian

McDermott ("Mr. McDermott") appeared on behalf of the JDV Defendants. Although Corporate Counsel for the City of New York appeared for the First Settlement Conference on behalf of Third-Party Defendant The City of New York (the "City"), they requested, and were granted, leave to depart those proceedings early, as it was, and has since remained, the City's position that it would not be participating in, or contributing to, any settlement that may be reached among the Parties.

21.    Though productive, the prime action was not resolved at the First Settlement Conference. At the conclusion of the conference, the Parties agreed to return for a second settlement conference (the "Second Settlement Conference") before Judge Parker. The Second Settlement Conference was scheduled for **April 25, 2024**, which, upon the Court's grant of the Parties' consent letter motion for an adjournment of those proceedings, was rescheduled for June 24, 2024. ECF No. 155.

22.    Following the First Settlement Conference, the Akela Defendants properly served a non-party subpoena *ad testificandum* upon Johnson Udoye, P.E. ("RE Udoye"), the City's Resident Engineer in connection with the Flatlands project, which, as noted above, was by far the largest of the projects relevant to this action, and, accordingly, for which the greatest number of crossing guard/non-union flagger hours had been recorded.

23.    A Resident Engineer on a New York City public construction project plays a critical role in overseeing and ensuring the successful execution of construction activities in compliance with project specifications, safety standards, and legal requirements. Among their responsibilities, Resident Engineers monitor daily construction activities to ensure that the work is being prosecuted in accordance with approved plans, drawings, and specifications, and for which they, and the team of inspectors working alongside them, are present daily, and at all times that work is being performed, in order to inspect construction materials, processes, and methods.

24.     In addition, the Resident Engineers review the contractors' payment requisitions to ensure that the work completed aligns with the amount being requested for payment, and that the projects' workers are properly compensated for their services, both in terms of hours for and rates at which they are to be paid.  As is relevant, here, this includes ensuring that all workers for whom the payment of a prevailing wage is required, based on the tasks actually performed by them, are, in fact, paid at such rates.

25.     RE Udoye's non-party deposition was held on May 21, 2024, at Akela's counsel's New York offices.  The deposition lasted a full day, and elicited testimony that was materially relevant and probative with respect to Plaintiffs' and the putative class members' entitlement to the payment of a prevailing wage for the tasks that they actually performed in connection with the Flatlands project.

26.     When RE Udoye was read, verbatim, various of the relevant Plaintiffs' allegations and sworn representations as to their performance, in furtherance of the Flatlands project, of tasks beyond mere traffic control, and upon which their claims of entitlement to the payment of a prevailing wage were wholly based, he consistently testified that any such allegations or sworn representations were false, as none of the Flatlands crossing guards/non-union flaggers ever performed any tasks other than civilian traffic management, and for which the payment of a prevailing wage was, pursuant to the express directives of the project's relevant specification, not required.

27.     Moreover, RE Udoye testified that there was no possibility that any of the Flatlands crossing guards/non-union flaggers could ever have performed any tasks for which the payment of a prevailing wage would have been required, as he and his team of inspectors—who were ever present in the field whenever work was being performed, and, accordingly, had ample opportunity

to observe the crossing guards/non-union flaggers in the performance of their duties—would have immediately intervened and arrested any such performance as beyond the scope of tasks that such workers were permitted to perform, which were limited to assisting with the off-site management of civilian pedestrian and vehicular traffic, and for which the Project's relevant specification expressly directed that the Akela Defendants were not required to pay them a prevailing wage. At the conclusion of the day's proceedings, Plaintiffs' Counsel reserved his right to request that RE Udoye return and give testimony under oath in response to any questions that he might have of him. RE Udoye agreed to do so.

28.     Shortly thereafter, and in light of the particularly damaging nature of RE Udoye's testimony, the Parties embarked upon a fresh round of good faith settlement negotiations. During this time, Plaintiffs continued to receive additional payroll data to further refine their damages model for settlement discussions. After several weeks of back and forth via e-mail and telephone, the Parties reached a settlement in principle that contemplated payments being made by both the Akela Defendants and JDV Defendants. The Parties confirmed all material terms of their settlement via e-mail on June 21, 2024.

29.     As part of the aforesaid settlement in principle, the JDV Defendants were required to voluntarily proffer to the remaining Parties documents and records sufficient to demonstrate its inability to contribute more than the sum to which it had already committed itself, and which sum was substantially less than the figure to be contributed by the Akela Defendants, the impetus behind such disclosure requirement being the Akela Defendants' desire to ensure that they were not unfairly being made to shoulder a disproportionate share of the financial burden associated with the Parties' settlement.

30.     In accordance with the aforesaid agreement to disclose, the JDV Defendants thereafter proffered to the remaining Parties sufficient financial records to satisfy their respective counsel as to the JDV Defendants' inability to contribute more money toward the settlement. Specifically, counsel for Plaintiffs and the Akela Defendants received from the JDV Defendants' counsel Mr. McDermott's most recent personal tax returns, as well as the relevant corporate tax returns for the entity JDV Defendants of which he was the sole principal and owner. The JDV Defendants' accountant also furnished Plaintiffs and the Akela Defendants' counsel with information concerning the status of the entity JDV Defendants' operation as going concerns, and by which they were able to confirm that both of those entities had gone inactive in or about 2023, and during the action's pendency, as well as the status of current IRS audits into the entity JDV Defendants. According to Mr. McDermott's accountant, it is highly likely that the JDV Defendants will be required to file for bankruptcy relief in the not-too-distant future.

31.     It bears noting in this regard that Mr. McDermott is, currently, also a defendant in connection with an action captioned *Citizens Bank, N.A. v. Brian McDermott*, which remains pending before the U.S. District Court for the Eastern District of New York under Civil Action No. 2:24-cv-03894(JS)(ST) (E.D.N.Y.) ("*Citizens Bank*"). Per the Complaint (the "Citizens Complaint") in that action, Mr. McDermott has been sued by Citizens Bank, which has asserted claims sounding in, *inter alia*, breach of contract and fraudulent conveyance, and for which the bank seeks to recover from him damages in a total approximate amount of $1,093,115.23, exclusive of any interest accruing thereon, and whatever attorneys' fees it may also be entitled to recover under the circumstances. *See Citizens* Complaint pages 10-14, a true and correct copy of which is annexed hereto as **Exhibit D**.

32.     Over the next several months, the Parties negotiated the terms of the long form settlement agreement into which they anticipated entering, as well as the proposed form of notice of settlement to be sent to the putative settling collective members, and in furtherance of which efforts they exchanged several dozen emails, participated in numerous, lengthy group conference calls with counsel, and exchanged multiple competing redlines of the draft Settlement Agreement.

33.     On March 5, 2025, the Parties reached agreement on what they believed, at that time, would be the finalized statement of the terms and conditions governing their settlement. Copies of that agreement were circulated to the Parties for signature, which Plaintiff executed on March 6, 2025.

34.     While awaiting the remaining Defendants' signatures, counsel for the JDV Defendants contacted Plaintiffs' and the Akela Defendants' counsel in order to advise them that the JDV Defendants would be unable to honor its payment obligations under the then-current version of the settlement agreement, and, accordingly, could not sign same.

35.     In determining the appropriate next steps to be taken as a result of the JDV Defendants' eleventh-hour abandonment of the Parties' settlement, the undersigned conducted an updated investigation as to their solvency. This investigation revealed nothing positive about their financial circumstances and ability to contribute to any settlement into which the Parties might enter; in fact, their circumstances appear only to have further deteriorated in the intervening period between the undersigned's two asset investigations. Only further confirming the JDV Defendants' financial woes, Mr. McDermott's attorney has moved the court in the *Ctizens Bank* action referenced, *supra*, for leave to withdraw as his counsel, and which application was granted on March 11, 2025. **Ex. D**, Citizens Docket Entries 26-30.  As such, any possibility that the *Citizens Bank* action would be

resolved so as to prevent its interference with any subsequent collection effort herein has been all but outright eliminated.

36.    After several conversations with Plaintiff, a further investigation into the JDV Defendants' financial circumstances, and review of the status of the competing *Citizens Bank* litigation, it is Plaintiffs' Counsel's fervent belief that, regardless of the JDV Defendants' inability to contribute financially to the Parties' settlement, it is nonetheless still in Plaintiffs' best interest to proceed with the settlement, and with the Akela Defendants agreeing to bear sole responsibility for the payment of the entirety of the  maximum sum of $340,000.00 (the "Settlement Sum") required by the Parties' settlement.

37.    Having conferred at length with the Akela Defendants' counsel on this point, it has been made clear to the undersigned that, absent the JDV Defendants' release of, *inter alia*, any and all claims that they now have or may hereafter have as against the Akela Defendants, the Akela Defendants, who have appropriately placed a premium on the finality that could only be achieved by permitting the JDV Defendants to remain parties to the settlement, would be forced to abandon the settlement and resume litigation. Indeed, it is precisely for this reason—the need to obtain the JDV Defendants' release of all claims as against the Akela Defendants—that the JDV Defendants cannot be excised from the settlement agreement.  According to the Akela Defendants' counsel, his clients' payment of the entirety of the Settlement Sum, although, perhaps, far from fair or ideal, is nonetheless a price that they are willing to pay to be released of any and all claims by the JDV Defendants, and, in turn, ensure the finality of the Parties' settlement.

38.    Having agreed that the JDV Defendants would be permitted, in consideration of their release of any and all claims against the Akela Defendants, and despite their inability to pay, to remain parties to the Parties' settlement, the Parties wrote the Court to request the convening of a

settlement status conference in order to discuss these eleventh hour developments, and the steps that the Parties had agreed to take as a result thereof.

39.    On March 27, 2025, the Parties, by and through their respective counsel of record, appeared before Judge Parker for a settlement status conference, and at which time they updated the Court with respect to the status of the Parties' finalization of the settlement that they had previously noticed.

40.    Thereafter, the undersigned made the few modifications to the existing settlement agreement necessary to render it consistent with the Parties' understanding that the Akela Defendants would be responsible for remitting payment of the entirety of the Settlement Sum, in consideration of which the JDV Defendants would, *inter alia*, release any and all claims that they now have, may have had, or may hereafter have, as against the Akela Defendants.

41.    On April 28, 2025, the Parties executed the revised settlement agreement (the "Settlement Agreement"), a true and correct copy of which has been appended hereto as **Exhibit A**.

## The Settlement, Litigation Risks, & Notice Process

42.    At all times, negotiations in this case have been hard-fought and undertaken at arm's-length.

43.    Although Plaintiffs believe their claims have merit, they recognize the legal, factual, and procedural obstacles to recovery, as both sets of Defendants have and will continue to vigorously contest their claims, both individually and on a class-wide basis. In light of the strengths and weaknesses of the case, as made evident by the testimony of RE Udoye, alone, F&S believes that the settlement as currently provided for in the Settlement Agreement more than passes muster on reasonableness grounds, as it achieves a significant benefit for Plaintiffs and the members of the settling collective in the face of multiple, significant obstacles.

44.    As noted, *supra*, the settlement negotiations were, at all times, hard fought and at arm's-length, and have produced a result that F&S believes to be in the best interests of the Plaintiffs' and the members of the settling collective in light of the costs and risks of continued litigation.  Moreover, in the undersigned's estimation, and based on the evidence already of record, including, but not limited to, the testimony of RE Udoye, the settlement represents a fair compromise of Plaintiffs' claims.  Indeed, given the strong possibility that the triers of fact will ultimately deem credible the testimony of RE Udoye, to say nothing of the other relevant projects' Resident Engineers, all of whom are expected to testify consistently with RE Udoye in the event that this case were not to settle, there can be little doubt as to the fairness and reasonableness of the Settlement Sum.  Indeed, it is for this very reason that the Akela Defendants' counsel has repeatedly reminded the undersigned throughout the Parties' settlement negotiations that the Akela Defendants' willingness to pay any sum in settlement of this action is informed less by concerns over being ultimately adjudicated liable to Plaintiffs on their claims than it is the desire for economic expediency.

45.    Litigating this case through to trial readiness would have required the expenditure a tremendous amount of time and resources by all Parties. Specifically, the Akela Defendants' counsel has repeatedly advised the undersigned that, absent settlement, he will assuredly seek to depose the remaining relevant Resident Engineers, and, using the transcripts of their and RE Udoye's depositions, the Named Plaintiff and each Opt-In Plaintiff thereafter.  For their part, Plaintiffs would seek to depose both the Akela Defendants' and JDV Defendants' principals and field-level supervisors on the relevant projects' job sites. Moreover, further paper discovery from the City would also be required, including, without limitation, records bearing specifically on the tasks actually performed by Plaintiffs and their fellow crossing guards/non-union flaggers, all of

which exist exclusively in paper format, and whose production and review would, therefore, be highly time-consuming and costly.

46.     Moreover, following the completion of fact discovery, substantial motion practice is all but inevitable.  Plaintiffs would likely move the Court to certify a FED. R. CIV. P. 23 class with respect to Plaintiffs' state law claims, which the Akela Defendants will vigorously contest. In addition, the Akela Defendants' counsel has already advised the undersigned that, absent settlement, he anticipates moving the Court, upon the completion of the necessary discovery, to decertify the conditionally certified Collective Action, and in support of which application he intends to argue that class and/or collective treatment of any of the Plaintiffs' claims is patently improper.  Both Plaintiffs and the Akela Defendants would likely also move for summary judgment following the completion of discovery.

47.     As explained in detail, *supra*, the testimony of RE Udoye drastically increased the risk of recovery for Plaintiffs. RE Udoye's testimony flatly contradicted the Plaintiffs' allegations and otherwise sworn representations as to their performance of tasks for which they contend that the payment of a prevailing wage was required, as well as the preemptive safeguards that he and his team of inspectors implemented so as to prevent, or immediately stop, any crossing guards/non-union flaggers from performing any tasks other than those for which they were hired: off-site management of civilian pedestrian and vehicular traffic, and for which the project's relevant specification directed that the payment of a prevailing wage was not required.

48.     Indeed, during his day-long deposition, RE Udoye emphatically disputed the truthfulness and accuracy of all of Plaintiffs' factual allegations and sworn representations as to their performance of tasks requiring the payment of a prevailing wage.  The Akela Defendants, fully cognizant of the damage done by RE Udoye's testimony, repeatedly advised the undersigned

throughout the Parties' settlement negotiations that, should the action not settle, his clients would promptly seek to depose the Resident Engineers on all other relevant projects, all of whom he expected to testify consistently with RE Udoye. Indeed, according to the Akela Defendants' counsel, all of the City's Resident Engineers that he has deposed in the various other crossing guard putative class actions that he has defended have testified consistently with RE Udoye and one another. The Akela Defendants' counsel has also indicated his intention to depose various of the union laborers that also worked on the projects relevant to this action, and who he contends performed the very tasks requiring the payment of a prevailing wage that Plaintiffs claim to have performed, and are prepared to testify to that effect and in a manner consistent with testimony of RE Udoye. Based on the foregoing non-exhaustive list of factors impinging upon Plaintiffs' likelihood of success in this case, the undersigned would respectfully submit that the Parties' settlement is consummately fair and reasonable.

49. Still further, there were very real concerns—apparently well founded—regarding Defendants' ability, from a financial perspective, to pay a sum larger than the Settlement Sum in order to resolve the action. In this regard, it again bears noting that the entity JDV Defendants ceased operating as going concerns during the action's pendency. This, coupled with the JDV Defendants' insolvency, as confirmed by the undersigned's asset investigations and Mr. McDermott's relevant documentary proffers, all but guarantee that, whether individually or collectively, the JDV Defendants will be judgment proof.

50. Moreover, were the JDV Defendants to hereafter seek bankruptcy relief—an entirely likely scenario—any non-prevailing wage claims, such as those that have been asserted under the New York Wage Theft Prevention Act ("WTPA"), would be irrevocably compromised. Specifically, insofar as it was the JDV Defendants that were the Plaintiffs' and collective members'

direct employers, Plaintiffs would be required establish that the Akela Defendants and JDV Defendants were "joint employers" such that former may be held liable for the latter's WTPA violations.  In a similar case, the Honorable Andrew L. Carter, U.S.D.J., dismissed the joint employer allegations against the City's prime contractor, where its subcontractor, who directly employed the workers in question, had declared bankruptcy.  *See Moses v. Consol. Edison Co. of New York Inc*., No. 18-CV-01200 (ALC), 2024 WL 1329800, at *7 (S.D.N.Y. Mar. 28, 2024) (in flagger/crossing guard case granting defendant prime contractor summary judgment on joint employment theory as to non-prevailing wage claims).

51.    Damages in this case are contingent upon various factors. First and foremost, other than the WTPA claims, in order for Plaintiffs to prevail on any of their remaining claims, they will be required to demonstrate that, in addition to their civilian traffic control duties, they (i) performed the tasks of a traditional construction laborer, and/or (ii) directed the movement of construction equipment from within and without active worksites.  Indeed, according to the City's relevant specification, Section 6.52 CG of the New York City Department of Transportation's Standard Highway Specifications, Vol. II of II, dated August 1, 2015 (the "Highway Specifications"),[1] it was only upon such a showing that a crossing guard, for whom that self-same specification directed that the payment of a prevailing wage would ordinarily not be required, would become entitled to the payment of a prevailing wage.  Accordingly, were the trier of fact to conclude that Plaintiffs have not, and/or cannot, carry their burden of demonstrating their performance of tasks for which the relevant specification directed that the payment of a prevailing wage was required, their damages, if any, would be, at best, *de minimis*.

---

[1] A true and correct copy of Section 6.52 CG of the Highway Specifications is appended hereto as **Exhibit E**.

52.    Accordingly, the best way to evaluate Plaintiffs' potential for recovery is through the use of a sliding scale based on the percentage of the Plaintiffs' and collective members' hours, across all projects throughout the relevant time period, that were spent performing tasks for which the payment of a prevailing wage was required.

53.    At one end of this scale, would be zero percent (0%), which would account for the possibility that Plaintiffs and their fellow crossing guards never performance, at any time throughout their respective involvement in any of the relevant projects, any tasks for which the payment of a prevailing wage would have been required.  Such a position would be consistent with RE Udoye's testimony, wherein he affirmed, forcefully and unequivocally, that none of the Flatlands crossing guards ever perform any prevailing wage tasks, and only were engaged in civilian traffic management, for which the payment of a prevailing wage was not required.

54.    At the other end of the scale, because Plaintiffs' job duties indisputably included off-site civilian traffic management, for which the payment of a prevailing wage was not required under Section 6.52 CG of the Highway Specifications, its upper limit cannot be one hundred percent (100%).  As such, a maximum percentage less than 100% was necessary.  As a starting point for the Parties' negotiations, the undersigned proposed a sliding scale from 0% (no time spent performing tasks for which the payment of a prevailing wage was required) to 80% (time spent performing tasks for which the payment of a prevailing wage was required).

55.    Thus, the range of potential recovery for base prevailing wages, FLSA/NYLL overtime, and supplemental benefits is $0.00 (0%) to $3,520,000.00 (80%). Breaking this down further for clarification, base FLSA overtime damages are $0.00 (0%) to $465,418.18 (80%).

56.    Thus, the $340,000.00 settlement encompasses approximately 9.66% of the potential exposure, inclusive of owed prevailing wages, base overtime, and supplemental benefits.

In real world terms, this settlement presupposes that, out of an 8-hour day, Plaintiffs, in addition to their traffic control duties, (i) performed traditional construction laborer tasks, and/or (ii) directed the movement of construction equipment in, on, and off active worksites, for about 46 minutes.

57.    The Settlement Agreement covers individuals who were employed as crossing guards/non-union flaggers by Defendants in connection with various public works construction projects on which Akela Contracting LLC and/or Akela Contracting/Civetta Cousins JV, Joint Venture, LLC worked from January 1, 2019, through the date on which the Court shall have entered an order granting the instant motion and approving the Parties' settlement ("Relevant Statutory Period").  *See* **Ex**. **A** (Settlement Agreement) at ¶¶ 2.18; 2.23.

58.    Based on the relevant information disclosed in discovery, we estimate there to be approximately 180 Prospective Collective Members[2], inclusive of the Plaintiffs. The Settlement includes an upper echelon of eligible work hours covered by the Settlement. *Id.* at ¶ 2.18. Thus, there is an upper limiter of who is eligible to participate in this Settlement, and those individuals' damages were captured in the negotiation of the settlement.

59.    The Net Settlement Fund[3] will be divided on a pro-rata basis based on the formula set forth in the Settlement Agreement.  *See id.* at ¶¶ 4.5(A)-(B). The settlement formula is based on points system, whereby Named Plaintiff, Opt-In Plaintiffs, and Prospective Collective Members are assigned points based on the number of hours they worked on the relevant public works projects throughout the Relevant Statutory Period. *Id.* Thus, a Prospective Collective Member with more hours during the Relevant Statutory Period will receive a larger pro-rata share of the Net Settlement

---

[2] As such term has been defined in the Parties' Settlement Agreement.  *See* **Ex**. **A** at ¶ 218.
[3] As such term has been defined in the Parties' Settlement Agreement.  *See* **Ex**. **A** at ¶ 2.27.

Fund than a fellow Prospective Collective Member with fewer hours throughout that same time period.

60.     One of two notices shall be sent to Prospective Collective Members, should the Court approve the Settlement, depending on whether an individual previously filed an opt-in form in the litigation. *Compare* **Ex**. **B** (Opt-In Plaintiff Notice) *with* **Ex**. **C** (Prospective Collective Member Notice). Both Notices identify an individual's estimated share of the settlement.

61.     Specifically, Opt-in Plaintiffs will receive the Opt-In Plaintiff Notice attached as **Exhibit B**. Opt-in Plaintiffs do not need to return a Claim Form[4] to receive their individual settlement checks, and are, by virtue of their prior filing with the Court of forms by which each of them consented to join the conditionally certified Collective Action, automatically deemed to be participants in the settlement. **Ex**. **A** (Settlement Agreement) at ¶ 3.5(E). The Opt-In Plaintiffs shall only release claims if they were to negotiate their settlement checks. *Id.* at ¶ 5.1.

62.     Individuals who did not opt into the litigation previously will be sent the notice identified as **Exhibit C** (Prospective Collective Member Notice). This notice will include a Claim Form, which must be timely completed and returned within sixty (60) days of the date of its mailing in order for the receiving Prospective Collective Member to opt in to the Parties' settlement and, in turn, receive their settlement check.  **Ex. A** (Settlement Agreement) at ¶¶ 3.5(B), 3.5(C), and 3.5(E). Upon negotiating those checks, each such Prospective Collective Member will release Defendants. *Id.* at ¶¶ 2.14; 5.1.

63.     In the event that a notice packet is returned to sender, the Claims Administrator will take steps necessary to obtain an updated address and will remail the applicable Notice Packet to that individual

---

[4] As such term has been defined in the Parties' Settlement Agreement. *See* **Ex. A** at ¶ 2.4. *See also id.* at **Ex. C** (Claim Form).

64.     Only Participating Collective Members[5] who endorse and cash/negotiate their settlement checks will release wage claims under this Agreement. *Id.* ¶ 5.1(A). Specifically, only upon their endorsement and cashing/negotiation of their settlement checks, will Named Plaintiff and Participating Collective Members have voluntarily released and forever discharged Defendants, Released Entities[6], and the City of New York from all claims, demands, rights, actions, causes of action, liabilities, damages, losses, obligations, judgments, duties, suits, costs, expenses, matters and issues arising in any way during the period from January 1, 2019, through the date of the Approval Order, whether known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, liquidated or unliquidated, matured or unmatured, accrued or unaccrued, apparent or unapparent, including any unknown claims, that could have been, or might be, asserted in any court, tribunal or proceeding, **that arise out of, relate to, or concern the payment of wages**, including, but not limited to, any and all claims asserted in the Action[7], any and all statutory, constitutional, contractual and common law claims for unpaid minimum, regular, and/or overtime wages, prevailing wages, earned sick time, accrued benefit time, prevailing wages, supplemental benefits, unlawful kickbacks, improper and/or failure to provide wage notice, improper and/or failure to provide wage statement, spread of hours, unpaid gratuities, unpaid bonuses, unpaid service charges, living wage, tips, any related wage and hour claims, interest on such claims, penalties, damages, liquidated damages, attorney's fees, expenses, disbursements, litigation costs and fees, restitution, and/or equitable relief. *Id.* at ¶ 5.1(A) (emphasis added). This release includes any such claims arising under the New York Labor Law and/or the Fair Labor Standard Act and any other federal, state and/or local laws

---

[5] As such term has been defined in the Parties' Settlement Agreement. *See* **Ex. A** at ¶ 2.14.
[6] As such term has been defined in the Parties' Settlement Agreement. *See* **Ex. A** at ¶ 2.22.
[7] As such term has been defined in the Parties' Settlement Agreement. *See* **Ex. A** at ¶ 1.

governing the payment of wages. *Id.* The release with respect to the City of New York only applies to work performed at Covered Job Sites[8]. *Id.* at ¶ 5.1(A).  For purposes of clarity, the term Covered Job Sites refers only to Akela public works projects that were staffed with crossing guards by JDV, *i.e.*, the public works projects relevant to, and at issue in, the Action.  *Id.* at ¶ 2.19.

65.    This release is worded in this way given the ability for individuals to bring prevailing wage claims under either the NYLL or quasi-contractual causes of actions. Thus, unlike cases in which only FLSA claims have been asserted, such language is necessary in order to provide for the release of the prevailing wage claims brought in the Action.

66.    Individuals who receive a settlement check will have 90 days from the date on which their Prospective Collective Member Notice was received to endorse and case/negotiate same.  *Id.* at ¶ 3.5(H).

## CLAIMS ADMINISTRATION

67.    The Parties have retained Rust Consulting to administer the settlement process, an independent and well-resected claims administration company.  Among other responsibilities, the claims administrator shall be responsible for: mailing the Prospective Collective Member Notices and Opt-In Plaintiff Notices, calculating Participating Collective Members' respective shares of the Net Settlement Fund, receiving and processing Claim Forms, and issuing and mailing settlement checks to Participating Collective Members as provided in the Settlement Agreement.

68.    Rust Consulting is a competent and experienced claims administration firm and has been approved by many courts to administer class action settlements.  *See* **Ex**. **I**, Curriculum Vitae of Rust Consulting. The claims administrator's fees shall be paid from the Settlement Sum. While the Parties anticipate that the costs associated with their use of Rust Consulting as claims

---

[8] As such term has been defined in the Parties' Settlement Agreement.  *See* **Ex**. **A** at ¶ 2.19.

administrator will not exceed $11,000.00, the precise fee for their services will not be ultimately known until after the relevant settlement data has been transferred to them, and the notice process has been completed.

## SERVICE AWARD

69.     Pursuant to the Settlement Agreement, and subject to Court approval, a service award of $10,000.00 will be given to the Named Plaintiff, in addition to his pro-rata portion of the Net Settlement Fund, in recognition of the services he rendered on behalf of the other similarly situated to himself.  *See* **Ex**. **A** (Settlement Agreement) at ¶ 4.3(A).

70.     The Named Plaintiff was instrumental to the initiation and prosecution of this action, and expended considerable time and effort to assist Plaintiffs' Counsel[9] with this case. His services included, but were not limited to: informing counsel of the facts initially and as the case progressed; providing counsel with relevant documents in his possession; encouraging other individuals to participate in the action and settlement (12 opt-ins prior to court-authorized notice); assisting Plaintiffs' Counsel in reviewing Defendants' document production; assisting counsel to prepare for the settlement conference that took place before Judge Parker on March 13, 2024 (the "Settlement Conference"); appearing at and participating in the Settlement Conference; and reviewing and commenting on the terms of the Parties' settlement. Although no evidence or allegations of retaliation have been raised, the Named Plaintiff, like all named plaintiffs, undertook a risk that his name and information in the lawsuit are readily available through simple internet and Google searches and he could face difficulties obtaining new employment in the same or similar construction industry.

---

[9] As such term has been defined in the Parties' Settlement Agreement.  *See* **Ex**. **A** at ¶ 2.17.

## ATTORNEYS' FEES AND EXPENSES

71.    Pursuant to the Settlement Agreement, Plaintiffs' Counsel requests attorneys' fees in the amount of one-third of the Gross Settlement Fund ($113,333.33) and up to $5,000.00 in out-of-pocket expenses. **Ex. A** (Settlement Agreement) at ¶¶ 2.27(2), 2.27(3), 4.2(A).

72.    The aforesaid attorneys' fee and cost award has been explained in the Prospective Collective Member Notice and Opt-In Plaintiff Notice to be disseminated by the claims administrator, Rust Consulting, such that all Prospective Collective Members and Opt-In Plaintiffs can make informed decisions as to whether or not to participate in this settlement. See **Ex. B, C**.

73.    Plaintiffs' Counsel's request for one-third of the fund, or $113,333.33, is less than their current lodestar of $130,746.60.

### Firm Background & Experience

74.    F&S has significant experience prosecuting wage and hour and prevailing wage cases, and has obtained settlements in excess of $100 million for workers. F&S has been appointed as class and collective counsel in many Federal cases.  *See, e.g.*, *Imbarrato v. Banta Management Services, Inc.*, No. 18 Civ. 05422, ECF. No 114 (S.D.N.Y. Oct. 10, 2024); *Mangahas v. Eight Oranges Inc.*, No. 22 Civ. 4150, 2024 WL 2801922 (S.D.N.Y. May 31, 2024); *Smith v. Akela Contracting LLC*, No. 22 Civ. 01186, ECF No. 104 (July 12, 2023); *Lanning v. Wells Fargo Bank, N.A.*, No. 20 Civ. 2055, ECF No. 55 (S.D.N.Y. Nov. 24, 2021); *Spiciarich v. The Gorman Group, LLC*, No. 20 Civ. 646, ECF No. 31 (N.D.N.Y. Apr. 15, 2021);  *Bruno v. Wells Fargo Bank N.A.*, No. 19 Civ. 587 (RJC), 2021 WL 964938 (W.D. Pa. Mar. 15, 2021);  *Hernandez v. Lochend Energy Services*, No. 20 Civ. 00064, ECF No. 44 (D.N.D. March 5, 2021); *Bruton v. Pioneer Natural Resources Company*, No. 20 Civ. 00203, ECF No. 20 (W.D. Tex. Jan. 27, 2021); *Kirby v. FIC Restaurants, Inc.*, No. 19 Civ. 1306 (FJS/ML), 2020 WL 3501398 (N.D.N.Y. Jun. 29, 2020); *Lu v. OD*

*Inspections*, No. 20 Civ. 02063, ECF No. 24 (S.D. Tex. Dec. 24, 2020); *LeJeune v. Mammoth Energy Services, Inc.,* No. 19 Civ. 00286, ECF No. 102 (W.D. Tex. July 31, 2020); *Millin v. Brooklyn Born Chocolate*, No. 19 Civ. 3346, 2020 WL 2198125 (E.D.N.Y. May 6, 2020); *Warren v. MBI Energy Services, Inc.*, No. 19 Civ. 00800, ECF No. 33 (D. Colo. Feb. 25, 2020); *Carr v. Patriot Well Solutions, LLC*, No. 5:19 Civ. 00212, ECF No. 62 (W.D. Tex. Feb. 11, 2020); *Murillo v. Berry Bros. General Contractors, Inc.*, No. 6:18-cv-1434, 2019 WL 4640010 (W.D. La. Sept. 23, 2019); *Borecki v. Raymours Furniture Company, Inc*., No. 17 Civ. 01188, ECF No. 98 (Sept. 10, 2019); *Black v. P.F. Chang's China Bistro, Inc.*, No. 16 Civ. 03958, ECF No. 95 (N.D. Ill. Nov. 16, 2018); *Schaefer v. M&T Bank Corporation*, No. 14 Civ. 06622, ECF No. 90 (S.D.N.Y. Nov. 1, 2018); *De Jesus et al. v. Incinia Contracting, Inc.*, No. 17 Civ. 5733 (KHP), 2018 WL 3343236 (S.D.N.Y. June 22, 2018); *Suarez v. Rosa Mexicano Brands Inc.*, No. 16 Civ. 5464 (GWG), 2018 WL 1801319, (S.D.N.Y. April 13, 2018); *Zorrilla v. Carlson Rests., Inc*., No. 14 Civ. 2740 (AT), 2018 WL 1737139 (April 9, 2018); *Alverson v. BL Restaurant Operations LLC*, No. 16 Civ. 00849 (OLG) (RBF), 2017 WL 5491998 (W.D.T.X. Nov. 11, 2017).

75.    Brian S. Schaffer received a *Juris Doctor* degree (Dean's List) from New York Law School in 2003.  Mr. Schaffer was admitted to the bar of the State of New York in 2004, and is also admitted to the bars of the Second Circuit Court of Appeals and the United States District Courts for the Southern, Eastern, Northern, and Western Districts of New York.  He is a member in good standing of each of these bars.  Mr. Schaffer became a partner of F&S in January, 2008.  Prior to starting F&S, he was employed by The Law Firm of Louis Ginsberg, P.C., a plaintiff's bar firm specializing in employment law.  Thereafter, he was employed by two civil litigation firms in Manhattan, Freiberg & Peck, LLP, and Weiner, Millo & Morgan, LLC.  Since starting F&S in 2008, Mr. Schaffer has exclusively represented plaintiffs in employment litigation and other employee

rights matters.  He has successfully argued cases in the New York State Appellate Division.  He is a member of the National Employment Lawyers Association ("NELA"), NELA's New York Chapter, the New York County Lawyer's Association ("NYCLA"), and the American Bar Association ("ABA"), and has served as a panelist at CLE presentations for wage and hour issues for NELA, NYCLA, American Conference Institute (ACI) and Lawline.

76.     I have been employed at F&S from May, 2015, to December, 2021, as an associate attorney, and as a partner from January, 2022, to the present. I graduated from Boston College in 2009, and received my J.D. from Suffolk University in 2012, *cum laude*. I am admitted to practice law in the states of New York (2015), Massachusetts (2012), and Florida (2013). Prior to joining F&S, I practiced wage & hour law at a boutique plaintiffs' firm in Miami, Florida. During my time at F&S, I have exclusively represented plaintiffs in employment litigation, focusing on wage and hour class/collective actions, and have successfully litigated and resolved cases as both a supporting and lead attorney. I am also admitted in the United States District Court for the Southern, Eastern, and Northern Districts of New York, the Southern and Middle Districts of Florida, the District of Massachusetts, the District of Colorado, the District of North Dakota, the Western District of Arkansas, and the Second Circuit Court of Appeals. I am a member of NELA and NELA's New York Chapter, and have served as a panelist at a CLE presentation for wage and hour issues for NYCLA.

77.     Katherine Bonilla has been employed at F&S since November, 2021, as an associate attorney. Ms. Bonilla graduated from John Jay College of Criminal Justice in 2015, and received her J.D. from The Benjamin N. Cardozo School of Law in 2019. While in law school, Ms. Bonilla was a Notes Editor for the Journal of International & Comparative, Policy & Ethics Law Review, and interned at the New York State Attorney General's office and the National Labor

Relations Board. Ms. Bonilla was admitted to practice in the state of New York in 2020. Prior to joining F&S, Ms. Bonilla worked at a boutique employment firm where she worked on cases focusing on employment discrimination and sexual harassment. During her time at F&S, Ms. Bonilla has exclusively represented plaintiffs in employment litigation, focusing on wage and hour class/collective actions, and has successfully litigated and resolved cases as both a supporting and lead attorney. She is also admitted in the United States District Court for the Southern and Eastern District of New York. Ms. Bonilla is a member of NELA.

78.     Molly Lakis has been employed at F&S since 2017 as a paralegal. Ms. Lakis assists in the daily operations of the office, and supports the attorneys with research for ongoing investigations. Ms. Lakis received her B.A. from Lycoming College with a double major in Criminology and Spanish and a minor in Psychology. As a fluent Spanish speaker, Ms. Lakis functions as one of our translators, and works closely with our partners and associates to help facilitate communication between our Spanish-speaking clients and the firm.

79.     Nicole D'Apice has been employed at F&S since November, 2016, as an administrative assistant.  Ms. D'Apice graduated from College of Staten Island in June, 2016, with a B.A. in Geography.

80.     Kelle Mejia has been employed at F&S since November, 2021, as an administrative assistant.  She is a graduate of LaGuardia Community College, with an AS degree in Criminal Justice.

81.     Dianni Rodriguez has been employed at F&S since 2017 as an administrative assistant. Ms. Rodriguez assists in the daily office operations, and helps ensure seamless communication between our clients and staff.

82.     Rose Trinidad has been employed at F&S since 2019 as an administrative assistant. Ms. Trinidad assists in the daily operations of the office, such as assisting with translation, data entry, generating correspondence and maintaining client files.

## LITIGATION HOURS, COSTS AND EXPENSES

83.     The Retainer Agreements signed by Named Plaintiff states that F&S would undertake this matter on a contingency fee basis of one-third percent (33.3%) plus all reasonable expenses. Moreover, the opt-in forms signed by Plaintiffs designate Named Plaintiff and his counsel to represent them and make decisions on their behalf concerning the litigation and any settlement and state the contingency fee arrangement of one-third percent.

84.     F&S ordinarily and regularly bills legal time on an hourly fee basis by the tenth of an hour, based upon each attorney's standard hourly rate.

85.     As of the filing of the instant motion, Plaintiffs' Counsel has spent over 358 hours litigating and settling this case.  Throughout the litigation, Plaintiffs' Counsel has been available to clients around the clock via phone and email. The hours reported are reasonable for a case of this complexity and magnitude, and were compiled from contemporaneous time records maintained by each attorney participating in the case. F&S keeps contemporaneous billing records for all matters.

86.     Since November, 2014, all of F&S's cases have been taken on pure contingency, including all out-of-pocket costs and expenses. Thus, when F&S's lawyers spend time on contingency matters, they do so at a significant risk for the firm. F&S frequently turns away cases, including hourly matters.  As of November 13, 2014, the date of the last hourly matter undertaken by the firm, the partner rates for Mr. Schaffer and Mr. Fitapelli were billed to clients at $500 per hour.

87.     Below are charts summarizing the specific attorneys, their hourly rates, and their total time worked on this matter, in addition to the total paralegal and administrative time.

27

| Fitapelli & Schaffer, LLP[10] | | | |
|---|---|---|---|
| **INDIVIDUAL, POSITION** | **HOURLY RATE** | **TOTAL HOURS** | **FEES** |
| Brian S. Schaffer, Partner | $650 | 4.70 | $3,055.00 |
| Armando A. Ortiz, Partner | $450 | 105.6 | $47,520.00 |
| Katherine Bonilla, Associate | $350 | 222.6 | $77,910.00 |
| Molly Lakis, Paralegal | $150 | 4.1 | $615.00 |
| Nicole D'Apice, Administrative Assistant | $125 | 2.6 | $325.00 |
| Kellee Mejia, Administrative Assistant | $150 | 5.95 | $892.50 |
| Dianni Rodriguez, Administrative Assistant | $125 | 2.15 | $268.75 |
| Rose Trinidad, Administrative Assistant | $150 | 10.35 | $160.35 |
| **Total** | | 358.05 | **$130,746.60** |

88.     In my experience, administering class and/or collective settlements of this nature and size requires a substantial and ongoing commitment, and the requested attorneys' fees are not based solely on time and effort already expended, but are also meant to compensate Plaintiffs' Counsel for time that they will be required to spend administering the settlement in the future and until completion.

**Risk of Litigation**

89.     Plaintiffs' Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis in the face of tremendous risk. The retainer agreement signed by Named Plaintiff reflects this. Large-scale wage-

---

[10] Contemporaneous time records shall be submitted upon request of the Court.

related cases of this type are, by their very nature, complicated and time-consuming. Attorneys undertaking representation of large numbers of affected employees in wage-related actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, attorneys are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind.

90.    For example, in *Benavidez v. Plaza Mexico, Inc.*, No. 09 Civ. 5076 (KNF) (S.D.N.Y.), and *Paez v. Plaza Mexico, Inc.*, No. 09 Civ. 9574 (KNF) (S.D.N.Y.), defendants filed for bankruptcy relief after extensive discovery and motion practice. Even after the court entered a judgment against the defendants in excess of $5,000,000.00 following a trial on damages, neither the plaintiffs nor F&S have collected any money in connection with either of those cases. In *Matheson v. T-Bone Restaurant, LLC a/k/a Strip House New York*, No. 1:09-cv-04214 (DAB) (S.D.N.Y.), at the time of the plaintiffs' motion for final approval of class settlement, F&S's lodestar was negative 1.43. During the subsequent three years, F&S expended further time and resources in collecting the settlement payment; to date, the *Matheson* defendants remain in default, as they still owe $123,574.64 out of the total damages award of $495,000.00.

91.    As an example of the risks of proceeding to trial, in *Rios et al. v. Louya Corp. et al.*, No. 1:14-cv-06800 (GHW) (S.D.N.Y.), F&S obtained a verdict of $1,044,512.62 on behalf of seven restaurant workers after a week-long bench trial. However, due to the defendants' bankruptcy filings, it is unlikely that the plaintiffs or F&S will recover any significant money in that case. The above three examples highlight the risks associated with settlement and obtaining a judgment after trial. Indeed, F&S has also recovered no monies or has otherwise had a negative lodestar in other cases as well.

92.    As an example of the resources required for, and risks associated with, taking a salary misclassification case to the decertification and Rule 23 class certification stage, in *Scott v. Chipotle Mexican Grill, Inc*. No. 12 Civ. 8333 (ALC)(SN) (S.D.N.Y.), Plaintiffs' Counsel and their co-counsel took or defended approximately 100 depositions, and formally responded to written discovery for an ever greater number of plaintiffs. Moreover, after five years of litigation and substantial discovery, the *Scott* plaintiffs' collective of over 500 employees was not only decertified, but their motion for class certification was denied as well.  *See* No. 12 Civ. 8333 (ALC)(SN), 2017 WL 1287512, at *1 (S.D.N.Y. Mar. 29, 2017). F&S and its co-counsel appealed this decision, which the Second Circuit granted in part, and denied in part, three years later. *Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 503 (2d. Cir. 2020)

93.    As an example of the risks of continued litigation to the summary judgment stage, in *Martin et al. v. Sprint United Management Co., et al*., No 15 Civ. 05237 (PAE), ECF No. 322 (S.D.N.Y. Sept. 27, 2017), the S.D.N.Y. granted the defendants' motion for summary judgment, resulting in a full dismissal of the plaintiffs' individual and collective wage and hour claims.

94.    As can be seen from the examples above, Plaintiffs' Counsel stood to gain nothing in the event that any of those cases were unsuccessful.

95.    To date, Plaintiffs' Counsel has worked without compensation of any kind, and the fee has been wholly contingent upon the result achieved.  Plaintiffs' Counsel continues to take on difficult cases like this one because we believe that they are important, as many individual workers may be unwilling or unable to front the costs of litigation for an outcome that is uncertain.

**Litigation Costs & Expenses**

96.    Plaintiffs' Counsel has incurred the following out-of-pocket litigation costs in pursing this matter, which were incidental and necessary to the representation of Plaintiffs and the settling collective.

| F&S Expenses | |
|---|---|
| SDNY Filing Fee | $402.00 |
| Rust Consulting Invoice for 216(b) Notice Campaign (litigation) | $2,711.64 |
| Process Server Expenses As to Akela Defendants | $418.5 |
| Transcript of Udoye Deposition | $1,349.25 |
| **TOTAL** | **$4,881.39** |

*See* **Ex. H**.

97.    Attached as **Exhibit A** is a true and correct copy of the parties' Settlement Agreement, which was fully executed by the parties on April 28, 2025.

98.    Attached as **Exhibit B** is a true and correct copy of the negotiated and proposed Notice to Opt-in Plaintiffs.

99.    Attached as **Exhibit C** is a true and correct copy of the negotiated and proposed Notice and Claim Form to Prospective Collective Members.

100.    Attached as **Exhibit D** is a composite exhibit comprised of true and correct copies of the docket of *Citizens Bank v. Brian McDermott*, No. 2:24-cv-03894(JS)(ST) (E.D.N.Y.) and the filed complaint.

101.    Attached as **Exhibit E** is a true and correct copy of the NYC DDC Highway specifications regulation entitled "Section 6.52 CG – Crossing Guard."

102.    Attached as **Exhibit F** is a true and correct copy of the order granting approval in the case of *Gillett v. Zara USA, Inc*., No. 1:20-cv-3734 (KPF), ECF No. 150 (S.D.N.Y. May 20, 2024).

103.    Attached as **Exhibit G** is a true and correct copy of the order granting approval in the case of *Schaefer v. M&T Bank Corporation*, No. 1:14-cv-06622(PGG), ECF No. 90 (S.D.N.Y. Nov. 1, 2018).

104.    Attached as **Exhibit H** is a true and correct copy of F&S' summary of expenses in this matter, along with relevant receipts and invoices.

105.    Attached as **Exhibit I** is a true and correct copy of Rust Consulting's CV and qualifications.

106.    Attached as **Exhibit J** is a true and correct copy of Plaintiffs' proposed Approval Order granting Plaintiffs' Motion for Approval of Collective Action Settlement.

I declare that the above is true and correct under the penalties of perjury.

<center>*       *       *</center>

Dated: New York, New York
       April 28, 2025

<div style="margin-left:40%">

Respectfully submitted,

/s/ Armando A. Ortiz
Armando A. Ortiz

**FITAPELLI & SCHAFFER, LLP**
Brian S. Schaffer
Armando A. Ortiz
Katherine Bonilla
28 Liberty Street, 30th Floor
New York, New York 10005
Telephone: (212) 300-0375

*Attorneys for Plaintiffs*

</div>

<center>32</center>